Okay our second case this morning is number 17-1744 Nestle Arena Pet Care Company versus Oil Dry Corporation. Mr. Marshal before we get into the merits of the case I think the panel would like to clear up what the agreement of the parties is about the remand. As I understand it the parties agree that there should be a remand to consider this new evidence though there is a disagreement about whether we should remand for consideration of a fraud issue. But putting that to one side there's an SAS issue in this case because even though the board instituted as to all claims it did not institute as to all grounds and I guess the first question is this is Nestle seeking a remand to have the board consider the additional grounds. Your Honor we believe that the case should be remanded for that reason the SAS reason as well as the other reasons stated in our motion to remand. So you anticipated my introduction here which is that there is agreement that the case should be remanded here. Our grounds for remand and we believe the court should instruct the board on remand to consider the new evidence to consider the allegations of fraud before the IPR. I'm trying to figure out where the light of day is between the two of you if there is any light of day because that was part of the confusion on Friday. So you both agree that the board should look at the new evidence, right? Hold on just one second. Why don't we start the argument clock and just so that we're clear Mr. O'Quinn, you agree that there should be a remand on the SAS ground as well? Yes, Judge. Okay, so why don't you start the clock. I'm sorry, go ahead. Okay, I'm trying to understand. So you both want it to go back for SAS and Mr. O'Quinn agrees that the board can consider any new materials that you want to submit. Well, Mr. Quinn in his letter said that they would not object to the board considering the new materials and you know I mean there are situations where the agency refuses to reopen the record and refuses to reconsider. The home products case which we cited in our motion to remand is one such instance and in that case the court said that there was a prima facie case of material misrepresentations that were made to the agency and the agency had to reconsider there. And so we think it would be grossly inefficient for this to go back down to the board, the board to refuse to reopen the record notwithstanding their commitment to not object and then have us be right back here before you again. So what we're asking for is for there to be an instruction from the court that the board here to consider to reopen the record, consider the new evidence and determine whether or not in fact that there were material misrepresentations made in front of the board. And I mean it wouldn't make any... That's a stretch, isn't it? I mean there is a potentially you're arguing that there was an error but I don't see any evidence here that there was an intentional misrepresentation. What's the evidence of that? Well, Your Honor, we have evidence. Well, first of all, we have OilDry consistently stating in their papers that a person of ordinary skill in the art cannot possibly determine the composition of the two commercial litters in mixture 11 of the Pattengill reference. Then in discovery we find that and they submitted... They made a mistake. Why is that a misrepresentation? I don't think it was a mistake, Your Honor. We have, for example, the inventor of the 119 patent who received the reports in the 90s, the annual analysis of competitive products. This is Mr. Goss who met with Maurice Pattengill, the inventor of the Pattengill reference, and then he's sitting at the hearing in the IPR while these misrepresentations were being made, not saying a word. Mr. Hertford says he does a search within OilDry for documents but on deposition he says he hasn't found a single person in his R&D department as to whether or not any annual analysis was done. They have a whole library of competitive products, not a single question about that. Instead, he does two keyword searches provided to him by counsel and, you know, finds nothing on a document management system which was inherently unreliable. I don't understand why, I mean, you guys can say it was a mistake or it was fraud, but do we have to decide fault in order to recognize that the issue, that the new information is relevant to the issue being addressed? No, Your Honor. I don't think that you do need to decide that. I think the court can instruct the board to reopen the record and consider the new evidence without deciding that there was some kind of material misrepresentation made. I think this is, to me, this is analogous to Rule 60B standard, 60B2, newly discovered evidence which the party could not have uncovered using reasonable diligence. But you're interpreting their motion on Friday to be sort of a, you know, a sleight of hand that when they say they won't object you think that they kind of will object when they get back there? No, Your Honor, I'm not suggesting anything untoward with respect to Mr. O'Quinn. What do we argue? I think what we are asking for, asking the court to do that is in addition to what Mr. O'Quinn suggested, is actually instruct the agency to reopen the record and allow the new evidence to come in and reconsider their prior decision. But they don't seem to disagree with that. I thought they actually said because there's going to be further development on remand, the board should be permitted to look at the new documents. I don't, if that seemed to be a pretty affirmative statement. If we're all in agreement on that point, then I suppose, you know, there's nothing else for me to discuss on that. I think the other issue that is probably worth bringing up, because the IPR is increasingly, and the appeal, increasingly focused on the new evidence on the composition of the commercial products. One thing that the board did not consider below was our argument that mixture 11 was mathematically or logically certain to meet the mean particle size and limitations of the claims. Could you back up just a moment? I'm a little unclear here. There are three claim limitations which are at issue here. Is that the two millimeter limitation, the four millimeter limitation, and the greater than limitation? Yes. And if I understand correctly, you say that these new documents show that the TidyCat product is non-swelling and the ScoopFresh product is swelling, and that enables them to determine that the two and four millimeter limitations have been met. But do these new documents bear on the issue? They do a sieve analysis of the two litters, so there is evidence that is relevant to that issue, your honor, and so we think they do. But if you just look at the mixture 11, the non-swelling clay is capped at 2.36 millimeters, so you know it meets the limitation of being less than four. The swelling clay, the ScoopFresh, is capped at, I think it's 1.18 millimeters, so you know it meets the limitation of being less than two. And what about the greater than limitation? For the greater than, you have all of the swelling clay between 0.6 and 1.18. You have about 30% of the non-swelling clay in that same range, and then you have 70% of the non-swelling clay between 1.18 and 2.36. So you know that the mean particle size limitation, when you have 70% of that non-swelling clay higher than all of the swelling clay, you know that the non-swelling clay must be greater in size. And they don't contest that in their brief. That was our second point on appeal. The only thing they argued in response was composition. They did not argue size. They didn't contest that point. The board completely overlooked that issue, and we think it would be appropriate for the court to provide some clarification on that, on remand, lest we end up here yet again. Anything else? I don't think so. I think I can reserve the rest of my time for rebuttal at this point, Your Honor, unless the court has any further questions. I don't think so, thank you. All right, thank you. Mr. O'Quinn, so what's the Thank you, Judge Dyke, and may it please the court. I think that with respect to the issue of remand, the differences here are fairly minor. But they go to an issue that OilDry does care about, and this is the accusation and the assertion that OilDry is engaged in some sort of intentional fraud before the board. And the main point, Judge Dyke... I predict that we are not going to remand and tell them to investigate fraud. I anticipate that that would be the case as well, based on your I think that if OilDry agrees that the case should be remanded, it's certainly not on the basis of any purported fraud on the board. And so we strenuously object to their suggestion that the court should instruct the board to consider whether OilDry should be sanctioned pursuant to 37 CFR 42.12. I think that is the principal difference in terms of the remand issue. The parties both agree that SAS is applicable here because there are non-instituted grounds that weren't a patent owner response. Obviously the board only instituted on certain grounds before. That necessarily is going to involve some reopening of the record. And as my letter of Thursday indicates, we don't object to the consideration of the documents that were identified in Nestle's motion when the matter is remanded before the board. I actually read it to be not just that you wouldn't object, but you said that the board should be permitted. I think it is appropriate. I think those were your words. Yes, I agree with that. It's not just that we do not object, but indeed I don't see how the record cannot be reopened in front of the board in light of the fact that there are now grounds that we will need to respond to in a patent owner response, because our patent owner response was previously limited to the instituted grounds, which was the combination of Patten, Gill and Hughes. But wait, let me just be clear about this. I understand that you don't object to these documents being considered in connection with the new grounds. Is it also the case that you don't object to these documents being considered with respect to the old grounds? Judge Dyke, we do not object to the documents being considered with respect to the old grounds, and that stated that in our letter of Thursday as well. So I think that largely resolves the remand issue. The disagreement here is over their attempt to have this court put its imprimatur on the notion that there's been some sort of fraud before the board, and the specific instructions that they are asking for, I think, are simply inappropriate. We wouldn't necessarily order the board to institute on all other grounds and allow you to file more because even under their own practices, the director has said that they have the right to choose not to institute at all if they don't want to institute on all grounds. Well, that's certainly fair, and this is a case where the board only instituted on one set of grounds after having rejected various grounds. We filed a petition, that is oil dry filed a petition for rehearing on those grounds, and so I think the board has a number of options that it could pursue here on remand. Our modest point is that we don't have an objection if the board the board, if it's going to institute, I think SAS makes clear that it needs to institute with respect to all claims, and as interpreted at least in Polaris, all grounds, and therefore we don't have an objection. If the board does so, then obviously the board will need to consider a record that addresses all of the grounds. I would like, if there are further questions on this, I'm obviously happy to answer those, but if not, I would like to address briefly the point that my colleague has made about what they're calling on appeal now, a logical certainty or a mathematical certainty argument with respect to mean particle size of the mixture 11 of Pattengill. The greater than limitation. Yes, that's exactly right, Judge Steig. This goes to the greater than limitation. Of course, in part three of our appeal argument, or the argument in our brief on appeal, we explain the fallacy of taking endpoints and essentially determining the median as opposed to the mean. Everybody remembers mean, median, and mode from high school, and that's essentially what their argument is, that you can take the midpoint, and their argument on mathematical certainty with respect to the compositions that are disclosed, or to calculate based on the range that is disclosed in Pattengill. Number one, it's a new argument on appeal. It wasn't entirely clear to me that this was an argument that they were making as a separate argument until their reply brief. If you look at Appendix 110 to 111 and Appendix 114, they don't make the mathematical certainty argument that they're making now, but it suffers from the same flaw, and that is this. It's not a mathematical certainty. If these particle sizes fell at the low end of the two ranges, and then you do the math, you could come up with the allegedly non-swelling clay at being only at one millimeter, and meanwhile the allegedly swelling clay would be at 1.18 millimeters, and that then wouldn't meet the greater than limitation that you were referring to Judge Dyke. And of course, inherency, which is what they are relying on to make this type of argument, requires a certainty, as this court said, in par pharmaceuticals. It can't be the probabilities. It has to absolutely be that way, and so this mathematical certainty argument they're making suffers from the same flaw of them taking the endpoints. It's they're taking the endpoints of two groups, assuming the middle of those two groups, and then doing some math with the two groups, and that suffers from the same flaw, because at the end of the day, it depends on the distribution within each group. Okay, anything further? If the court has no few points, in reference to Mr. O'Quinn's last argument, the suggestion that we waived this argument with respect to mixture 11 is just flat wrong. It's on pages 36 and pages 37 of our opening brief. It was also raised below. I don't have that record citation at the moment, but it was. But he's not wrong about the fact that smaller particle size can bring down the weighted average, right? When you have all of your swelling particles in this range, and only 30% of your particles in that same range, and 70% of the non-swelling over here, much higher, it is a logical impossibility to have the swelling particles greater than the non-swelling. This argument was not addressed by the board, right? It was not addressed by the board. It was raised below, and it was not addressed by the board. So you'll have an opportunity to ask them to address it on the remand? Yes, Your Honor. I guess what we are suggesting is that since the argument is fully briefed, and the court has invested some time in looking at it, that in its discretion, the court could provide some guidance to the board on the issue. So that's the request. Of course, that's entirely discretionary at this point, what type of instructions you provide on remand. The other thing I guess I would like to point out is, you know, the idea that all of the particles would be on one end or one extreme or another of, you know, the sieve sizes is just utterly contrary to all of the extraordinary steps are taken to refine the particle size distributions of the particles. They will exhibit typical particle size distribution curves. It's generally assumed that the distributions within the sieve fractions are normal and produce a mean particle size equal to the average of the sieve intervals. So it's, the contention is just flies in the face of everything that their expert says. You're saying that you think, logically, it's more likely that it would be a normal distribution, but inherency in the obviousness context requires that it must, it always have that particular result, right? Well, their experts are saying that no effort was taken to, that these were randomly mined and that no steps were taken to refine the particle size distribution. And so in these circumstances, what I'm saying is that a bell-shaped distribution of the particles is a certainty there, in those circumstances. And their experts agree with that. All the articles that they cited agree with that proposition. You know, I think the, I guess the final point of clarification that I would make, Your Honor, is we filed this motion to remand with the court as soon as we became aware of the documents that contradicted the representations they had made in the IPR. Since that time, discovery has continued in the district court case. In fact, it recently wrapped up. We did not put in front of the court every single document or deposition transcript that we believe demonstrates the material misrepresentations that we, that were made. And so again, on what I, what I don't want, I don't want there to be any confusion that these are the only documents that we're asking the, that we're going to be asking the board to further questions. It sounds like we're in agreement that there should be a remand, and that's exactly what we're requesting. Okay, thank you, Mr. Marshall. Thank you. Thank both counsel. The case is submitted.